# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| JAX TRANSIT MANAGEMENT CORP., | ) ) ) |
| Plaintiff, | ) ) |
| v. | )  CASE NO.: |
| AMALGAMATED TRANSIT UNION, LOCAL 1197, | ) ) ) ) |
| Defendant. | ) ) ) |

## COMPLAINT

Plaintiff, JAX TRANSIT MANAGEMENT CORP. (hereinafter referred to as "Plaintiff" or "JTM"), by and through its undersigned counsel, hereby files this lawsuit against Defendant, AMALGAMATED TRANSIT UNION, LOCAL 1197 (hereinafter referred to as "Defendant" "Local 1197" or "the Union"), and alleges as follows:

## INTRODUCTION

Plaintiff hereby files this Complaint for breach of contract and declaratory relief against the Union. As described below, JTM is a not-for-profit Florida corporation created by the Jacksonville Transportation Authority ("JTA") to provide the JTA with bus operators and maintenance personnel. JTA is the sole stockholder of JTM. Effectively, the JTA owns JTM.

Local 1197 represents a large portion of JTM's frontline employees, so the parties are in a collective bargaining relationship that is governed by a collective bargaining agreement ("CBA"). As a condition to the JTA receiving certain grant funding from the federal government, the federal government requires the parties to agree on the terms of a Public Transportation Agency Safety Plan ("PTASP") for the JTA annually.

The parties have complied with this federal requirement for many years in the past without incident. Unfortunately, Local 1197's representatives now refuse to sign off on the 2025 PTASP for arbitrary and capricious reasons. Local 1197's improper conduct, which violates its contractual obligations under the CBA to engage in good-faith bargaining over workplace issues such as safety, places JTM and the JTA in an untenable position.

This is not a minor requirement. The JTA's entitlement to certain federal funds is based on having an approved PTASP. Unfortunately, the JTA cannot unilaterally approve the PTASP even if Local 1197 fails to articulate any basis for withholding its approval. The members of the parties' Safety Committee, which consists of an equal number of management and union representatives, must unanimously approve the PTASP. In other words, Local 1197 can place the JTA's federal funding in danger by refusing to sign the PTASP. So it is here. The Federal

Transit Administration ("FTA") has recently threatened to withhold from the JTA over $100 million dollars in grants if the parties do not agree on the annual PTASP.

Given Local 1197's bad-faith conduct, JTM seeks this Court's intervention to require the Union to comply with its contractual obligation to arbitrate any dispute over the PTASP. It can either proceed to arbitration or it can approve the PTASP. It cannot do nothing. In support of its Complaint, JTM states as follows:

## PARTIES

1. Jax Transit Management Corp. is a not-for-profit Florida corporation created by the Jacksonville Transportation Authority to provide JTA with bus operators and maintenance personnel. JTM operates out of the same address as JTA, and JTA is the sole stockholder of JTM. In common parlance, JTA effectively owns JTM. Indeed, JTA maintains control over the overall operation and business of JTM. The JTA itself, which is governed by a Board of Directors, is an agency of the State of Florida created by Chapter 349, Fla. Stat.

2. Defendant Amalgamated Transit Union Local 1197 is a labor union that represents the majority of JTM's non-managerial frontline employees for purposes of collective bargaining. Local 1197's headquarters are in Jacksonville, Florida.

## JURISDICTION

3. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a), because this matter arises under federal law, in that JTM seeks a court order

compelling Local 1197 to participate in the parties' arbitration process so that JTM may ensure compliance with a federal statute and its implementing regulation, 49 U.S.C. § 5329 and 49 C.F.R. § 673.19.  JTM also seeks to enforce the parties' arbitration provisions under the CBA because the Union's failure to participate in this process impacts funding available to JTM under a federal statute, 49 U.S.C. § 5307.

## VENUE

4.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff JTM is a corporation created by a governmental agency that is a resident of Jacksonville, Florida, which is in the Middle District of Florida.  Local 1197 also resides in the Middle District of Florida, and the events giving rise to the JTM's claim all occurred within this district.

## BACKGROUND

**A.    Federal Law Requires Mass Transit Systems Such as the JTA to Enter into PTASPs to Ensure Federal Funding.**

5.      In 1964, Congress enacted the Urban Mass Transportation Act, now known as the Federal Transit Act, "to foster the development and revitalization of public transportation systems with the cooperation of both public transportation companies and private companies engaged in public transportation."  49 U.S.C. § 5301(a).

6. Under the Federal Transit Act, the FTA approves of funding grants to mass transit systems, including the JTA, to operate and improve their operations. For example, the Urbanized Area Formula Funding Program, codified at 49 U.S.C. § 5307, makes federal grants available to the JTA and other transit agencies across the country for operating assistance and transportation related planning. These funds are often referred to as "Section 5307" funds. In the case of the JTA those funds can amount to hundreds of millions of dollars each year. That funding is used to make critical improvements, repairs, and extensions of the JTA's system, among other things.

7. In 2012, Congress passed the Moving Ahead for Progress in the 21st Century Act ("MAP-21"), which was a funding and authorization bill primarily addressing federal surface transportation funding.

8. In Section 20021 of MAP-21, which is now codified at 49 U.S.C. § 5329, Congress directed the FTA to establish a comprehensive Public Transportation Safety Program. MAP-21 required, as one element of this more comprehensive Program, that each covered public transportation system operator, such as the JTA, develop and implement a PTASP. *See* 49 U.S.C. § 5329(d).

9. Each PTASP must include, among other things: a requirement that the board of directors, or equivalent entity, approve the plan and any updates; methods for identifying and evaluating safety risks throughout all elements of the recipient's

5

public transportation system; and strategies to minimize the exposure of the public, personnel, and property to hazards and unsafe conditions. *See id. §* 5329(d)(1).

10. The FTA implemented regulations on the PTASP requirement by issuing a final rule in 2018, which is now located at 49 C.F.R. § 673.1 *et seq.* That regulation required covered transit agencies to certify a PTASP was in place by December 31, 2020.

11. For recipients of funds that serve urbanized areas with a population of 200,000 or more, such as the JTA, the PTASP statute requires that the "recipient's" Safety Committee approve of the PTASP and any updates to same. *See* 49 U.S.C. § 5329(d)(1)(A). Under the law, a "safety committee" must consist of an equal number of management representatives, on the one side, and on the other side, frontline employee representatives selected by the labor organization that represents a plurality of the frontline workforce employed by the fund recipient. *See* 49 U.S.C. § 5329(d)(5).

12. The PTASP statute allows the FTA to take enforcement action against a recipient such as the JTA that does not comply with the PTASP requirement. Enforcement may include, among other measures, withholding the funding, often referred to as federal financial assistance, to which a recipient would otherwise be entitled.

**B.     JTM and the JTA's History of Safety Compliance**

13.     JTM has a long history of taking proactive steps to care for the safety of its employees and the public.  For example, for many years before the FTA's PTASP requirement JTM maintained safety-related practices and procedures that were updated annually.

14.     Since the FTA began requiring PTASPs in 2020, JTA has had a PTASP in place until Local 1197's recalcitrance described below has resulted in a PTASP without unanimous approval for this year.

15.     Even before it became a federal requirement under the MAP-21 statute and its regulations, JTM maintained a joint safety committee for many years.  In line with the statute, that committee currently consists of three management representatives and three union representatives selected by Local 1197.

16.     The parties' last approved PTASP was a comprehensive safety plan of over 130 pages that contained detailed practices and procedures to help JTM implement the JTA's safety goals.

**C.     Local 1197's Recent Obstinacy.**

17.     Unfortunately, for over a year now Local 1197 has not acted in good faith in complying with its own PTASP obligations.  The Union's obstinate behavior has not only impeded JTM's and the JTA's ability to comply with federal law, but it has also placed the JTA's access to federal funds at risk.

18. The parties had an operative PTASP for 2024. In or around November 2024, JTM and the JTA proposed revisions to that PTASP for the upcoming year. Those proposed revisions would have incorporated into the 2025 PTASP sections on the use of autonomous vehicles in a program known as the Ultimate Urban Circulator ("U2C"). The proposed language briefly described the U2C service, then explained the rigorous safety and testing process that would be undertaken before the U2C program was put into place. In particular, that language states, "The route, stops, infrastructure and vehicles undergo a vigorous testing process before the U2C service is certified as safe for revenue service. This includes testing conducted at JTA's Armsdale Test and Learn Facility, factory acceptance testing at the vehicle manufacturer/upfitter, and functional and operational testing at a specialized vehicle testing track, before final testing and certification along the Bay Street Innovation Corridor. The U2C service, operations, vehicles, stops, etc. will be certified as safe for revenue service in accordance with established Federal Transit Administration Safety & Security Certification processes and requirements, prior to revenue service launch."

19. Local 1197 initially objected to the inclusion of the U2C program in the PTASP as a "mode of service." It also objected that service was "unsafe."

20. Yet, in the months following that initial proposal, Local 1197 has not articulated a single item or issue that it considers unsafe.

21. In contrast, JTM has provided ATU with evidence relating to the safety of autonomous vehicles and autonomous driving systems, its compliance with NHTSA and FMVSS standards, the extensive testing that must be passed before entry into revenue service, and the rigorous safety and security certification process that has been undertaken to ensure the safety of employees, passengers, and the public.

22. Indeed, even though Local 1197 has now been provided with volumes of information related to the U2C program, including, but not limited to, the Progressive Project Delivery Agreement with Balfour Beatty for the Autonomous Vehicle Design, Build, Operations and Maintenance Services for the Bay Street Innovation Corridor Project including all addenda, amendments, attachments, exhibits, extensions, and modifications; Balfour Beatty's proposal submitted resulting in the Progressive Project Delivery Agreement including all attachments; JTA Board and Board Work Session minutes for the past three years; and, documents related to statewide procurements of autonomous transit vehicles and current contracts, Local 1197 has still not articulated a single item or issue related to this autonomous program that it deems unsafe.

23. Given the lack of any substantive concerns raised by Local 1197 about the U2C program, it seems clear that the Union is acting in bad faith.

24. If the Union had legitimate safety concerns with the autonomous vehicle program, the Union was contractually obligated to raise those concerns, including at any Safety Committee meetings. Yet the Union's representatives did not even attend the Safety Committee's monthly meetings from February to July 2025, much less articulate any such concerns.

25. Further evidence of that bad faith is that the Union is misusing its PTASP approval as a bargaining chip over negotiations that have *nothing* to do with safety issues and that are not part of the PTASP.

26. For example, Local 1197 has stated is that it will agree to sign the PTASP if JTM and the JTA would commit to allowing the Union to organize the operating employees of the Neighborhood Autonomous Vehicle Innovation ("NAVI") contracted service for the Bay Street Innovation Corridor.

27. This proposal has nothing to do with the PTASP, so withholding PTASP approval over this issue is improper.

28. In any event, those individuals who work on the NAVI service are not JTM employees, so JTM cannot commit to anything related to them.

29. Local 1197 has also represented that it will sign the PTASP if JTM and the JTA would commit to allowing the Union to organize the operating employees of the St. Johns River Ferry contracted service.

30. Again, this proposal has nothing to do with the safety of employees, so conditioning approval of the PTASP on this issue is improper.

31. And as with the NAVI proposal, those individuals are also not JTM employees, so JTM cannot commit to anything related to them.

32. Finally, Local 1197 has committed to signing the PTASP if JTM would agree to provide a $1.00 per hour wage increase to ATU represented employees for the duration of JTA's contract with BEEP, its third-party operator.

33. Conditioning approval of the PTASP on a wage increase is, again, highly improper, especially given that the hourly rate of the Union's members are already set forth in the parties' collective bargaining agreement. Local 1197's use of the PTASP process to attempt to extract concessions from JTM that should be negotiating through the parties' established collective bargaining process is highly improper and inconsistent with the federal statute.

**D.    JTM's Attempt to Arbitrate the Dispute.**

34. As noted above, JTM and the Union are parties to a CBA with an effective term of August 15, 2024, to September 30, 2028.

35. Article 3 of the CBA requires the parties to mutually cooperate to resolve disputes in good faith, including by agreeing to meet at mutually agreeable times "as to any questions or grievances."

36. Article 34 of the CBA states that the parties agree to maintain an active Safety Committee. This Article of the CBA requires the parties to "cooperate fully" in reporting, investigating, and mitigating dangerous or unsafe conditions and/or practices."

37. Finally, Article 9 of the CBA states that if the parties cannot resolve a dispute between them over the meaning of the CBA or any alleged violation of the CBA that either party may submit that dispute to binding arbitration.

38. In accordance with the CBA, on August 6, 2025, JTM submitted a formal written demand for arbitration under the parties' collective bargaining agreement, pointing to its concerns about the Union's failure to meaningfully contest JTM's proposed changes to the JTA PTASP related to the U2C program.

39. The Union asked JTM to postpone moving the matter to arbitration so that the parties could meet and confer over the issue. To date, those meetings have been futile, with Local 1197 claiming that it was unable to sign the PTASP largely because the ATU's International Union would not let it do so.

40. On October 30, 2025, JTM, through counsel, informed the Union that its concerns still had not been resolved and, as a result, it wanted to move the matter forward into arbitration.

41. To date, the Union has not responded to this follow-up request.

42. Because JTM cannot unilaterally approve the 2025 PTASP, and because the Union refuses to engage in PTASP discussions in good faith, JTM needs to arbitrate over the safety issues discussed in this Complaint to determine whether the Union has any valid basis for withholding PTASP approval.

**E.     The FTA's Funding Threat**

43. On October 27, 2025, the FTA sent a letter to the JTA in which it threatened to withhold the JTA's access to certain funds until it certifies compliance with the PTASP requirements. To date, the JTA has been unable to certify that the Safety Committee has unanimously approved of the PTASP because the Union refuses to do so. The Union's failure to do so violates its contractual obligations under the CBA to cooperate, including about safety issues. And the Union's inexplicable refusals to engage with the JTM places JTA's funding at risk given the statutory obligation to have a PTASP in place.

## CAUSES OF ACTION

### COUNT I
**Breach of Contract (Including Specific Performance)**

44. JTM repeats and incorporates by reference the allegations in Paragraphs 1 to 43 of the Complaint.

45. JTM and Local 1197 are parties to a CBA.

46. The CBA is a valid contract.

47. The CBA allows disputes to be raised about safety issues.

48. That CBA contains a dispute resolution process culminating in binding arbitration.

49. JTM is ready, willing, and able to perform its obligations under the CBA to reach agreement over the PTASP and to resolve any disputes over safety-related issues through arbitration.

50. Local 1197 could comply with its contractual obligations under the CBA by approving the PTASP.

51. Local 1197 could comply with its contractual obligations under the CBA by agreeing to arbitrate any substantive dispute over safety issues that JTM has asked to be moved to arbitration.

52. Local 1197 has refused to arbitrate this dispute.

53. This Court should require Local 1197 to arbitrate.

54. If the Union continues to refuse to negotiate in good faith with JTM and arbitrarily and capriciously refuses to approve of the PTASP, the FTA could, as it has suggested it will, restrict the JTA's access to federal funds.

55. As that fund restriction would be caused entirely by the Union's contractual breach, this Court should also award JTM and the JTA an award of damages in an amount equal to any withheld federal funds.

## COUNT II
## Breach of the Covenant of Good Faith and Fair Dealing

56. JTM repeats and incorporates by reference the allegations in Paragraphs 1 to 43 of the Complaint.

57. As alleged above, JTM and Local 1197 are parties to a CBA that is a valid contract.

58. In every contract, there is an implied promise of good faith and fair dealing by which each party will do nothing to unfairly interfere with the right of the other party to receive the benefits of the contract.

59. Implied within the contractual relationship between JTM and Local 1197 is that the Union would act in good faith as part of its collective bargaining relationship with the JTM.

60. An obligation of good faith and fair dealing is also implied in 49 U.S.C. § 5329 and 49 C.F.R. § 673.19.

61. The Union has breached the covenant of good faith and fair dealing by acting in bad faith by arbitrarily refusing to agree to the PTASP without providing any substantive basis to disagree with the U2C additions to it.

62. The Union has breached the covenant of good faith and fair dealing by attempting to condition agreement to the PTASP on JTM's acquiescence to terms that have nothing to do with safety issues.

63. The Union has breached the covenant of good faith and fair dealing by refusing to arbitrate the dispute under the CBA.

64. As a direct and proximate result of the Union's wrongful conduct, JTM has been threatened with substantial losses and damages, including the potential loss of federal funding, which can be resolved only by the Union either agreeing to the PTASP or, at a minimum, agreeing to arbitrate the parties' dispute.

## PRAYER FOR RELIEF

For these reasons, JTM asks the Court to:

1. Order Local 1197 to arbitrate the parties' dispute over the PTASP;

2. Order damages in an amount to be determined based on any federal funds withheld from the JTA because of Local 1197's conduct;

3. Award JTM its costs and reasonable attorney's fees; and

4. Award any other relief that the Court deems equitable and just.

Respectfully submitted this 21st day of November 2025.

/s/ Lori K. Mans
Lori K. Mans
Florida Bar No. 012024
M. Christopher Moon (*PHV motion forthcoming*)
JACKSON LEWIS P.C.
501 Riverside Avenue, Suite 902
Jacksonville, FL 32202
Tel: (904) 638-2653
Lori.Mans@jacksonlewis.com
Christopher.Moon@jacksonlewis.com

*Attorneys for Plaintiff Jax Transit Management Corp.*

4923-2770-9047, v. 2